## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MZM CONSTRUCTION COMPANY, INC.,** **d/b/a MZM CONSTRUCTION** **MANAGEMENT & TRANSPORTATION,** <br><br> Plaintiff, <br><br> v. <br><br> **NEW JERSEY BUILDING LABORERS'** **STATEWIDE BENEFIT FUNDS,** <br><br> Defendants. | Civ. No. 18-16328-KM-MAH <br><br> **OPINION** |

**KEVIN MCNULTY, U.S.D.J.**:

This motion comes before this court on cross-motions for summary judgment filed by defendant New Jersey Building Laborers' Statewide Benefit Funds (the "Funds") and plaintiff MZM Construction Company, Inc. ("MZM"). (DE 45, 46.) The sole issue relates to MZM's having signed a short form agreement ("SFA") in 2002 that incorporated by reference a statewide collective bargaining agreement ("CBA"). MZM says that it signed the SFA only in relation to a particular project at Newark Airport. The Funds, sixteen years after the fact, now say that MZM agreed to abide by the CBA and its arbitration clause in relation to all subsequent projects. It has billed MZM for contributions based on MZM's use of non-union labor on various projects, and sought arbitration of the dispute. MZM, in contrast, argues that the contract was void from the start based on fraud in the execution, and that it therefore never became a signatory to the CBA. In the alternative, it argues that the 2002 SFA, even if valid, was a single-project agreement.

For the reasons set forth below, I find that MZM has proven its defense of fraud in the execution and I therefore **GRANT** summary judgment in favor of MZM and **DENY** summary judgment to the Funds.

## I.   Background[1]

In 1992, Marjorie Perry and two partners founded plaintiff MZM Construction Company, Inc. ("MZM"), a construction subcontractor headquartered in Newark, New Jersey. Perry has been the sole owner of MZM since 1994. (PSOMF ¶ 1–2.) MZM has performed work on the New Jersey Performing Arts Center, MetLife Stadium, Newark International Airport, and New Jersey Transit facilities. (Perry Decl. ¶ 4.)

Over the years, MZM has used union laborers when directed to do so by a project owner or general contractor on a particular project. (PSOMF ¶ 7.) In such a case, Perry would contact the representatives of the union and request the number of laborers needed for the project. (*Id.* ¶ 9.) On those projects, MZM would pay the union rates and make contributions to benefit funds as required by the underlying CBAs. (*Id.* ¶ 10.) Between 2001 and 2018, MZM contributed $547,366.09 to the Funds for work done on union projects. (DSOMF ¶ 52, 54.) In that period, MZM paid two arbitration awards related to delinquent contributions to the Funds. (*Id.* ¶ 59–60; DE 45-6, Ex. N.)

The issue here, however, relates to MZM's use of non-union labor on other, non-union projects. The Funds claim that MZM is subject to a statewide CBA, under which it owes contributions for all of those non-union laborers as well. Perry claims that she never executed such a state-wide collective bargaining agreement with the unions. (PSOMF ¶ 12.)

---

[1]    Certain key items from the record will be abbreviated as follows:

DE __ = Docket entry number in this case

Def. Br. = Defendant Funds' brief (DE 45-1);

Pl. Br. = Plaintiff MZM's brief (DE 46-3);

PSOMF = Plaintiff MZM's statement of undisputed material facts (DE 46-1);

DSOMF = Defendant Funds' statement of undisputed material facts (DE 45-2);

Perry Decl. = Nov. 19, 2018 Declaration of Marjorie Perry (DE 1-3);

3d. Cir. Op. = Third Circuit Opinion in this matter (DE 29-1), published as *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386 (3d Cir. 2020).

In 2002, however, Perry did sign a one-page "Short Form Agreement" ("SFA"), which is the key document here.[2] (*Id.* ¶ 28.) At the time she signed that SFA, MZM was working on Terminal C at Newark Liberty International Airport, a project which began in 2001 (the "Newark Airport project"). MZM was using union laborers for that project. (*Id.* ¶ 26–27.)

Perry states that she signed the agreement because union representatives whom she trusted told her (a) that if she did not sign, the union would stop work on the airport project; and (b) that it was a "single-project agreement," *i.e.*, that it applied only to the Newark Airport project and would not require her to use union labor on all future projects throughout the state. (*Id.* ¶ 29.) Specifically, Perry was approached by a union representative, Joe Taylor, business agent for the Building Laborers' Union Local 1153. (*Id.* ¶ 30.) Perry had dealt with Taylor for several years, having been introduced to him by Lynell Robinson, business agent for the Operating Engineers Local 825. (*Id.* ¶ 17–18.) Perry testified that she trusted both men and that Robinson had mentored her since 1992. (*Id.* ¶ 17–21.) Perry also testified that both Robinson and Taylor had told her that MZM was too small a company to sign on to the statewide CBA, and they knew that she wanted to avoid committing to use of only union labor. (*Id.* ¶ 21–22.) Both Taylor and Robinson represented to Perry that the 2002 SFA was a single-project agreement that was necessary for continued work on the Newark Airport project, but would not require MZM to use union labor across the state on other projects. (*Id.* ¶ 31.) No one deposed in this matter, other than Perry, has direct knowledge of the circumstances of the signing of the 2002 SFA; significantly, neither Taylor nor Robinson was deposed.

The 2002 SFA neither mentions arbitration nor states either way whether it is a single-project or ongoing agreement. It provides as follows:

---

[2]    As I explained in a previous opinion in this case, I do not attach much significance to a 1999 SFA agreement belatedly cited by defendants after they had filed their appeal. (DE 24 at 24–25; *see also* pp. 8–9, *infra.*)

> The undersigned Employer [*i.e., MZM*], desiring to employ laborers from the New Jersey Building Laborer Local Unions and District Councils affiliated with the Laborer's International Union of North America, hereinafter the "Unions," and being further desirous of building, developing and maintaining a harmonious working relationship between the undersigned Employer and the said Unions in which the rights of both parties are recognized and respected, and the work accomplished with the efficiency, economy and quality that is necessary in order to expand the work opportunities of both parties, and the Unions desiring to fulfill the undersigned Employer's requirements for such laborers, the undersigned Employer and Unions hereby Agree to be bound by the conditions as set forth in the 1999 Building, Site and General Construction Agreement, which Agreement expires April 30, 2002, and the successor Agreement to the 1999 Building Site and General Construction Agreement, herein referred to as the 2002 Building, Site and General Construction Agreement, which successor Agreement becomes effective May 1, 2002, both of which Agreements are incorporated herein as if set forth in full.

(DE 1–4.) Relying on Taylor's representations, and wishing to avoid any labor interruptions on the Newark Airport project, Perry signed the 2002 SFA. (PSOMF ¶ 32.)

Perry was not provided with a copy of the 2002 SFA or any CBA referenced therein. (*Id.* ¶ 34–35; DSOMF ¶ 50.) Perry had no further communications with the union or the Funds regarding the 2002 SFA until approximately sixteen years later, in 2018. (Perry Decl. ¶ 11–12.) Between 2002 and 2018, about one third of MZM's New Jersey projects were union jobs for which MZM paid in its contributions for benefits. The other two thirds, however, were non-union jobs for which no contributions were contemporaneously sought by the Funds or paid by MZM.[3] (*Id.* ¶ 83–93.) Perry states that, between 2002 and 2020, MZM did not sign any short form or single-project agreements with the union as a prime contractor. She notes, however, that MZM from time to time "performed union jobs pursuant to single

---

[3]     MZM worked on 69 projects between 2002 and 2018. Of those projects, 26 involved union labor. (DE 45-6, Ex. S; DE 46-2 ¶ 27.)

job agreements" in which MZM acted as a subcontractor to a prime contractor that was bound by the CBA.[4] (PSOMF ¶ 82, 96.)

In 2018, the accountants for the Funds requested access to MZM's "books and records," which Perry granted. (*Id.* ¶ 95.) That audit covered claimed contributions relating to work done between October 1, 2015 and September 30, 2017. (DSOMF ¶ 62.)  On June 27, 2018, the Funds' accountant told Perry that she owed contributions for work completed by non-union workers during that period. (PSOMF ¶ 97.) In response, Perry requested a copy of the document that the Funds' accountant relied upon in claiming that fringe benefits were owed. (*Id.* 98.) The Funds' accountant produced a copy of the 2002 SFA. (*Id.*) Shortly thereafter, the Funds also provided Perry for the first time with a copy of a Collective Bargaining Agreement between the "Employer" and "the Building Laborers' District Councils and Local Unions of the State of New Jersey ('Union')." That CBA says it covers a term beginning May 1, 2002 and ending April 30, 2007, with provision for automatic renewals. (*Id.* ¶ 99–100; DE 1-5 (hereinafter "2002 CBA").) By the terms of the 2002 CBA, the Employer could give 90 days' notice of its desire to renegotiate or 30 days' notice before April 30 of each year of its desire to terminate the agreement. (DSOMF ¶ 38.) MZM never attempted to terminate the CBA. (*Id.* ¶ 41.) This 2002 CBA is not signed by anyone. It is phrased generically and does not identify a particular contractor or employer on the signature line. (PSOMF ¶ 101; 2002 CBA at 69). Prior to receiving this copy of the 2002 CBA in 2018, Perry had never before seen this or any other CBA to which MZM was allegedly a signatory. (PSOMF ¶ 102.)

The Funds point to the 2002 CBA, which requires the (generic, unspecified) "Employer" to "remit fringe and benefit contributions to the Funds." (2002 CBA §14.00–14.90.) The Funds have also submitted a number of "Employer Contribution Reports," from May of 2012 and March through July of

---

[4]     MZM apparently concedes that, on such projects, it was bound to, and did, comply with the CBA's contribution, audit, and arbitration provisions.

2016. (DSOMF ¶ 52, 54; DE 45-6, Ex. L, Ex. M.)  Those reports, above Perry's signature on behalf of MZM, provide the following:

> THE UNDERSIGNED, an authorized representative of the above Employer, hereby agrees, on behalf of the Employer, to bind the Employer to all the provisions, terms and conditions of . . . the Collective Bargaining Agreement by and between the Building Construction Laborers' District Councils and Local Unions of the State of New Jersey and the Building, Site and General Construction Contractors and Employers, which Agreements and Declarations of Trusts and Collective Bargaining Agreements (the Agreements) are incorporated herein by reference.

(DSOMF ¶ 55.) That provision is not contained in all the reports, and it does not mention arbitration. Where it does appear, the font size of the provision is much smaller as compared to the other text in the reports. Additionally, each report is for a specific time period,[5] identifies a particular "jobsite," and provides contributions for a particular named employee. (*Id.*; DE 45-6, Ex. L, Ex. M). These remittance reports were generated on projects where MZM used union labor and appear not to have been used on the non-union projects at issue here.

On November 5, 2018, counsel for the Funds sent a demand letter to MZM. (PSOMF ¶ 107; DE 46-19, Ex. O). That letter stated that MZM owed the Funds $231,650.65 in unpaid contributions, including interest and audit fees, for MZM's nonunion projects. Failure to submit payment, the letter stated, would cause the Funds to submit the matter to arbitration on Tuesday, November 27, 2018, pursuant to the arbitration clause of the CBA. (*Id.*) The Funds assert that the 2002 SFA incorporated the 2002 CBA by reference and that therefore MZM obligated itself on all projects, with any disputes subject to arbitration under the terms of the CBA.[6] (Def. Br. at 6–7.)

---

[5]    For example, the first report in the exhibit is for May 13, 2012 through May 19, 2012. (DE 45-6, Ex. M.)

[6]    The Funds also assert that after the 2002 CBA expired, successive CBAs governed the parties' relationship: first, from May 1, 2007 through April 30, 2013 ("2007 CBA"); second, from May 1, 2013 through April 30, 2016 ("2013 CBA"); and third, from May 1, 2016 through present ("2016 CBA"). (DSOMF ¶ 39).

The 2002 CBA contains two distinct arbitration provisions, one for jurisdictional and the other for non-jurisdictional disputes. The second arbitration provision (2002 CBA, § 21.20) is the one potentially pertinent here.[7] Covering non-jurisdictional disputes, it provides for a three-step grievance procedure, the third step of which is arbitration. This grievance procedure governs all "questions or grievances" that involve the "interpretation and application" of the 2002 CBA, "or any grievance concerning any term or condition of work." (2002 CBA, § 21.20; *see also* 2002 CBA § 24.10 ("Any conflict in the interpretation of this agreement not settled directly by the Employer and the local Union shall be submitted to the Building Contractors Association of New Jersey and the Laborers' International Union of North America, Eastern Region office . . . for resolution. . . . If the foregoing parties fail to agree as to a resolution of the dispute, the dispute shall be subject to the

---

[7]     The CBA's first arbitration provision (§ 2.20), titled "Jurisdictional Disputes," is not directly relevant to this dispute. It covers disputes between or among unions over the assignment of work. *See Office & Prof'l Employees Int'l Union v. Sea-Land Serv., Inc.*, 210 F.3d 117, 118 (2d Cir. 2000) ("a jurisdictional labor dispute arises when two or more unions claim, under their respective collective bargaining agreements … the right to perform the same work assignment." (citing *Transportation-Communication Emp. Union v. Union Pac. Railroad*, 385 U.S. 157, 161 (2000))). It reads as follows:

> It is agreed between the Union and the Employer that this Agreement is applicable to all construction work that is described in this Agreement or the Manual of Jurisdiction of the Laborers' International Union of North America, which is incorporated herein by reference and any other work within the recognized and traditional jurisdiction of the Union and shall be performed in accordance with the terms of this Agreement. If the Union is aggrieved over any assignment, the matter shall be referred to the regional office of both contesting Unions in an effort to seek a resolution. If the matter fails to be satisfactorily resolved in this manner within three business days, the parties agree to submit the matter to the New Jersey State Board of Mediation for binding arbitration on an expedited basis. Any party that fails to abide by and cooperate with this expedited procedure shall be deemed to be in default and an order shall be entered by the Arbitrator in favor of the opposing party. Pending an orderly resolution of the matter, there shall be no interruption of work by a work stoppage, strike or refusal to refer men to the project by the Union.

(2002 CBA, § 2.20.)

grievance and arbitration procedure herein.").) Assuming the CBA applies, conflicts over the proper level of benefit fund contributions under the CBA would be handled under this arbitration clause.

On November 20, 2018, MZM filed suit in this Court and moved for an injunction to stay the arbitration hearing which the Funds had unilaterally scheduled for November 27, 2018. (DE 1.) MZM's complaint asserts two causes of action. The first count, under the Declaratory Judgment Act, 28 U.S.C. § 2201 and § 2202, seeks a declaration that MZM is not a party to or bound by the 2002 CBA, and is not required to arbitrate under the 2002 CBA. (DE 1 ¶ 49–67.) The second count alleges fraud in the execution, in that Perry signed the 2002 SFA without knowledge or a reasonable opportunity to obtain knowledge of the agreement's essential terms. (*Id.* ¶ 68–89.) If MZM prevails on either count, then arbitration will be denied because MZM never became a full signatory to the CBA.

The November 27, 2018 arbitration date was adjourned on consent, and on December 12, 2018, the Court heard oral argument on the preliminary injunction application. (DE 15.) The Court issued an Order, dated December 19, 2018, preliminarily enjoining the arbitration and ordering expedited discovery as to whether this matter is arbitrable. (DE 16.)

On December 20, 2018, the Funds filed a notice of appeal from this Court's December 19, 2018 Order. (DE 17.) On February 8, 2019, the Funds filed a motion for an indicative ruling under Federal Rule of Civil Procedure 62.1, and for relief under Rules 54(b) and 60(b). (DE 19.) That motion essentially argued that the Court should reverse its preliminary injunction ruling based on "newly discovered" evidence, consisting of another SFA executed by Perry, dating from October 1999. (DE 19-2.) In substance, this 1999 SFA is similar to the 2002 SFA, and was signed by Perry as MZM's principal.[8] (DE 19-2.)

---

[8]    The Funds argue that "successive" CBAs governed the parties' relationship after the term of the 2002 CBA expired. *See* p. 6 n.6, *supra.* Inconsistently, the 1999 document appends a "Trade Agreement History," which lists the "start" and "end" date

The Funds contended that this 1999 SFA would "substantially reduce[]" the likelihood of success on MZM's claims. (DE 19-2 ¶ 7.) This "newly discovered" evidence from 1999, said the Funds, was not produced earlier because records that predate 2001 were kept "off-site." (DE 19-2). I denied the Funds' motion, finding that there were still several disputed facts that suggested that the parties did not intend to incorporate the CBA in perpetuity and thus that there was reason to doubt that the parties had effectively agreed to arbitrate the issue of arbitrability. (DE 24.)

The Funds also filed a notice of appeal from that second decision (DE 26), and the two appeals were consolidated by the U.S. Court of Appeals for the Third Circuit. The Third Circuit affirmed my decisions and stated three holdings which help to clarify and narrow the issues for summary judgment on remand. (3d Cir Op.)

First, the Court of Appeals held that the federal policy in favor of enforcing arbitration agreements is premised upon the parties' having entered into an agreement in the first place. Thus this Court, not the arbitrator, had the power to determine whether an agreement was made, *i.e.*, whether such a contract between the parties was actually formed. (*Id.* at 14–16.) Examining several relevant precedents, including *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010), the Third Circuit panel concluded that "the text of section 4 of the FAA—mandating that the court be 'satisfied' that an arbitration agreement exists—tilts the scale in favor of a judicial forum when a party rightfully resists arbitration on grounds that it never agreed to arbitrate at all." (3d Cir. Op. at 23.)

Second, the Court of Appeals held that MZM had stated a claim for fraud in the execution, which, if proven, would void the contract. (*Id.* at 30.) In

---

of three trade agreements that, only the third of which is listed as "signed" by Perry. The first agreement started in 5/1/1999 and ended 4/30/2002; the second agreement was in effect from 5/1/2002 to 4/30/2007; and the third was in effect from 5/1/2016 to 4/30/2019. (DE 45-4, Ex. A.) The third agreement has a "received" date of 1/17/2019. No such signed agreements are in the record, although the Funds have provided unsigned copies of the CBAs. (DE 45, Exs. E, H, I, J.)

making this finding, the Third Circuit rejected the Funds' argument that MZM's claim was only for fraud in the inducement, which would have made the agreement voidable, not void. (*Id.* at 30–32.)

Third, the Court of Appeals concluded that I applied the correct standard of review when I refused to compel arbitration outright and instead ordered limited discovery regarding the circumstances surrounding contract formation. (*Id.* at 33–35.)

The Third Circuit's mandate was transmitted to this court on October 6, 2020. (DE 29.) The Funds then filed an answer (DE 32), and discovery proceeded. On November 8, 2021, the Funds moved for summary judgment, requesting that this court dismiss MZM's declaratory action and compel arbitration. (DE 45.) A month later, MZM cross-moved for summary judgment, requesting that this court declare that MZM had never become a full signatory to the statewide CBA with respect to future projects. The SFA, MZM argued, was at best a single-project agreement, requiring that the Funds' demand for arbitration regarding contributions on later, non-union projects be denied. (DE 46.) Both sides filed responsive briefs (DE 47, 51) and the cross motions for summary judgment are now fully briefed and ripe for decision.

## II.     Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, creates a strong federal policy in favor of arbitration. *See Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178–79 (3d Cir. 1999). To achieve that aim, the FAA authorizes a party to enforce a valid arbitration agreement by moving to compel arbitration. 9 U.S.C. §§ 2–4; *In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109, 116 (3d Cir. 2012). "Despite the liberal policy in favor of enforcing arbitration agreements . . . , a party cannot be forced to arbitrate unless 'that party has entered into a written agreement to arbitrate that covers the dispute.'" *U.S. Small Bus. Admin. v. Chimicles*, 447 F.3d 207, 209 (3d Cir. 2006) (quoting *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999)).

Arbitration is a matter of contract between parties, so a judicial mandate to arbitrate must be predicated on the parties' consent. *Guidotti v. Legal Helpers Debt Resolution*, L.L.C., 716 F.3d 764, 771 (3d Cir. 2013) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)). When a district court is presented with a motion to compel arbitration, the Court must first determine whether the agreement to arbitrate is valid, and then decide whether the dispute falls within the agreement's scope. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009).

Additionally, "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts "apply ordinary state-law principles that govern the formation of contracts." *Id.* at 944.

Under New Jersey law, "the law presumes that a court, not an arbitrator, decides any issue concerning arbitrability." *Morgan v. Sanford Brown Inst.*, 225 N.J. 289, 304 (2016); *see also N.J. Reg'l Council of Carpenters v. Jayeff Constr. Corp.*, 495 F. App'x 230, 232 (3d Cir. 2012) ("[T]he issue is whether a contract to arbitrate was ever entered into by the parties. In such a case, the court—not the arbitrator—has the power to adjudicate the issue."). Here, the Third Circuit has determined that this court has the power to determine whether the dispute is arbitrable. (3d Cir. Op. at 23.) The dispute can only be arbitrable if MZM agreed to become a full signatory to the CBA.

If summary judgment is not warranted in light of material factual disputes regarding an agreement's enforceability, a court should then proceed to trial "regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions." *Guidotti*, 716 F.3d at 776 (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). The Third Circuit has explained:

> Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.

*Par-Knit Mills*, 636 F.2d at 54.

Therefore, a demand for arbitration will be enforced only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 228 (3d Cir. 2012). Furthermore, "in reviewing the record, we are required to view the facts and draw inferences in the light most favorable to the nonmoving party." *Quilloin*, 673 F.3d at 228 (cleaned up).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   Discussion

This case hinges on the signing of the 2002 SFA. The Union contends that the 2002 SFA was validly entered into, and that it bound MZM to the CBA for all future projects. Thus, the argument runs, MZM was bound by the CBA to use union labor on future projects,[9] in any event to contribute to the Funds irrespective of whether it did so, and to arbitrate disputes regarding such contribution obligations.

Perry, however, contends that MZM is not so bound, based on two interrelated but distinct contentions: First, Perry argues that Taylor essentially tricked her into signing the 2002 SFA, which purportedly bound MZM to the CBA with respect to future projects. If so, MZM could render the contract void by proving fraud in the execution. Second, Perry argues that if Taylor did not intentionally mislead her, then the parties entered into a single-project agreement, and no more.

I consider both grounds. In Section III.A, *infra*, I hold that the 2002 SFA was void *ab initio* for fraud in the execution. In Section III.B, I hold that even if the parties entered into a valid agreement, it was a single-project agreement, as further evidenced by their course of conduct between 2002 and 2018. Summary judgment must therefore be granted in favor of MZM.

### A. Fraud in the Execution

Perry admittedly signed the 2002 SFA, so we start from the presumption that she assented to its terms on behalf of MZM. The Funds' position is consistent with the general rule that "where a party affixes [her] signature to a written instrument, ... a conclusive presumption arises that [she] read, understood and assented to its terms and [she] will not be heard to complain that [she] did not comprehend the effect of [her] act in signing." (3d Cir. Op. at

---

[9]   Here and elsewhere in this opinion, "future" projects are viewed from the standpoint of 2002.

25–26 (quoting *Peter W. Kero, Inc. v. Terminal Const. Corp.*, 6 N.J. 361 (1951)).)[10]

That, as the Third Circuit explained in its opinion on appeal from this Court's earlier rulings, is not the end of the inquiry. The presumption loses its force where there is fraud in the execution:

> There is an exception to this general rule when a party's "signature is obtained by fraud or imposition in the execution of the instrument." *Kero*, 78 A.2d at 817 (citations omitted). Fraud in the execution (or fraud in the factum) occurs when a party is compelled to sign the instrument "by reason of a misrepresentation intended to deceive [her] as to its purport or content[.]" *Id.* at 817–18. Because this rule is intended to protect both "the unwary and foolish as well as the vigilant," the signer's negligence in failing to read the instrument or "in trusting a representation" does not excuse the other party's intentional fraudulent act. *Id.* at 818. "This is particularly true where a relation of natural trust and confidence, though not strictly a fiduciary relation, exists between the [contracting] parties." *Id.* at 818 (citing 5 Williston on Contracts § 1516 (rev. ed. 1937)).

> Fraud in the execution may also be present "when a party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms" by reason of "excusable ignorance." *Connors v. Fawn Min. Corp.*, 30 F.3d 483, 490, 491 (3d Cir. 1994) (applying the Uniform Commercial Code in a labor case arising out of the LMRA and ERISA) (quotation marks omitted); see also Restatement (Second) of Contracts § 163 (1981). Although excusable ignorance does not require an affirmative intent to defraud, it typically involves some sort of misconduct or imposition that cuts off the signer's opportunity to read, such as "significant time pressure" and reliance on an erroneous "assurance" that the parties' oral understanding had been or would be accurately memorialized in an instrument. *Connors*, 30 F.3d at 488, 492–93. In short, "[f]ailing

---

[10]     Here, I consider evidence outside of the contract because "[w]hile the parol evidence rule generally prohibits the admission of evidence that contradicts the terms of an integrated, unambiguous writing, the 'rule does not apply to evidence introduced to show that a contract was void or voidable.'" *Connors v. Fawn Min. Corp.*, 30 F.3d 483, 493 (3d Cir. 1994) (quoting *Coleman v. Holecek*, 542 F.2d 532, 535 (10th Cir. 1976)).

to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading." *New Gold Equities Corp. v. Jaffe Spindler Co.*, 453 N.J. Super. 358, 181 A.3d 1050, 1064 (2018) (citation omitted).

(3d Cir. Op. at 27–28.)

There are thus two ways that fraud in the execution can occur. First, a party may be induced to sign by a misrepresentation regarding the contents of an agreement, especially when that misrepresentation is made by a trusted counterparty.[11] Second, a party may be otherwise prevented from learning the key terms of the agreement. Of course, it is possible for both factors to be present. The overall concept is that the signer was excusably ignorant of the terms (or claimed terms) of the agreement. *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992).

Fraud in the execution is not triggered by minor discrepancies; a party must show that she "signed an instrument that is radically different from that which [she] is led to believe that [she] is signing." *Connors v. Fawn Mining Corp.*, 30 F.3d 483, 491 (3d Cir. 1994). That materiality threshold is easily met here; an open-ended CBA covering all future projects (the Funds' version) is radically different from an agreement to pay union wages and benefits for a single project at Newark Airport (MZM's version). *See Iron Workers' Loc. No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F. Supp. 683, 690 n.12 (E.D. Mich. 1997) (finding "that an agreement that binds a party to the terms of a CBA for one job is of a different nature than an agreement that obligates the party indefinitely"); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33–34 (2d Cir. 1997) (finding that an unlimited CBA was a document of a different nature that a single-project agreement). Therefore, taking the Third Circuit's opinion on interlocutory appeal as my initial guide, I will examine whether MZM has

---

[11]     As one court put it, fraud in the execution "occurs where a party alleges that he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud." *Axalta Coating Sys., LLC v. Midwest II*, Inc., 217 F. Supp. 3d 813, 821 (E.D. Pa. 2016).

demonstrated that it was excusably ignorant of an agreement to be bound for all future projects.

Fraud in the execution is highly fact-bound and may depend on multiple factors. Review of some representative cases, however, may assist in formulating the analysis.

The classic scenario of fraud in the execution occurs when a party pulls a literal bait and switch, substituting a page of the agreement without the counterparty's knowledge. In *Hetchkop v. Woodlawn at Grassmere, Inc.*, for example, a construction company argued that it had entered into a single-project agreement with the carpenters' union to frame nine houses, while the union claimed the agreement was of unlimited duration. 116 F.3d at 29; *see also George v. Tate*, 102 U.S. 564, 570 (1880) ("It is well settled that the only fraud permissible to be proved at law in these cases is fraud touching the execution of the instrument, such as misreading, the surreptitious substitution of one paper for another, or obtaining by some other trick or device an instrument which the party did not intend to give."). The construction company claimed that its principal, DiGiovanni, had traveled to Staten Island and reviewed the written contract, which was a single-project agreement. *Hetchkop*, 116 F.3d at 30. Before DiGiovanni signed the agreement, however, the union official who had promised to give DiGiovanni a ride back to the job site announced that he was leaving. While DiGiovanni was distracted for a few seconds, the union switched out the relevant page indicating that it was a single-project agreement and replaced it with one establishing a contract of unlimited duration. *Id.* Ignorant of the switch, DiGiovanni signed the agreement, took his copy, and did not learn that he had signed on to an unlimited CBA until the lawsuit arose months later. *Id.* 30–31. The Second Circuit vacated the district court's grant of summary judgment to the union, finding that DiGiovanni's testimony, if accepted by a jury, would suffice to establish a defense of fraud in the execution. *Id.* at 33.

Less blatantly deceptive behavior, if reasonably relied on, may also suffice. A good illustration is the frequently cited Ninth Circuit case of *Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501, 1504 (9th Cir. 1984). That case held that Gilliam had a defense of fraud in the execution because of clear misconduct by the union. Gilliam, a bulldozer owner-operator, had sought simply to join the union to complete a single job. He was provided with pre-filled forms to sign. These were represented as standard forms to become a union member. In fact, one of the forms was an SFA requiring Gilliam to make contributions to the pension fund as an employer. *Id.* Gilliam was never provided with copies of the SFA or master CBA. *Id.* The Ninth Circuit concluded that Gilliam should nevertheless be excused from the obligation to contribute: "[U]nder the circumstances, Gilliam reasonably and justifiably thought the documents involved only an application for union membership and his signing of the short-term agreement did not create a binding collective bargaining agreement." *Id.* at 1505.

Particularly where there is an element of time pressure, the facts need not present the extreme three (well, two)-card-monte scenario of *Hetchkop*. The Third Circuit's leading fraud-in-the-execution case, *Connors v. Fawn Mining Corp., supra*, will illustrate. There, Fawn Mining Corp. purchased a Pennsylvania coal mine that was in the process of being shut down by its current owners. 30 F.3d at 486. In Fawn's estimation, the purchase would not be profitable if encumbered by existing pension and benefit obligations under the current CBA. *Id.* Fawn thus negotiated with the local union's president for an exemption from contribution to certain benefit plans. The local acquiesced in order to keep the mine open. *Id.* To make such an agreement, however, the union president would have needed authorization from the international union. *Id.* at 486–87. The mine was about to shut down, and time was of the essence. *Id.* at 487. Thus, on the final day that it was possible to transfer ownership, Fawn and the union local signed an agreement which consisted only of the final page of the current CBA. *Id.* Having thus executed the CBA, Fawn

17

purchased the mine the next day. *Id.* The purchase agreement stated that Fawn would take on the previous owner's obligations, with no mention of any agreed exemption from fund contributions. *Id.* As it turned out, Fawn never contributed to the benefit fund and shut down the mine ten months after purchasing it. *Id.* at 488.

The fund then sued Fawn, seeking payment of delinquent contributions. The Fawn executives believed that they had obtained an oral agreement to exempt Fawn from fund contributions; the local union president, however, claimed that he had agreed only to *seek* such an exemption. The Third Circuit overturned the district court's ruling in favor of the union on summary judgment. A jury could find, said the Court of Appeals, that fraud in the execution had voided Fawn's agreement to be subject to the CBA. *Id.* at 493. In particular, the impending closure of the mine could have resulted in "significant time pressure" that led Fawn to sign based solely on oral assurances of a side agreement to exempt it from fund contributions. *Id.* Thus it would be permissible to conclude that "[t]he employer has never manifested assent to the terms contained in that contract ... and the document itself has been procured by fraud" even though there was no physical page switching. *Id.* The combination of the union's allegedly untruthful representation that Fawn would be exempt from contributions and the time pressure caused by the impending mine closure provided Fawn a viable defense of fraud in the execution.

Finally, at the opposite end of the spectrum from *Hetchkop* are cases in which courts disallowed fraud in the execution because a party had been given sufficient time to review the terms of a contract but simply chose not to do so. *In Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line*, for example, the Third Circuit held that McCormick could not assert a fraud in the execution defense because its principal, Webb, had received a copy of the agreement well prior to execution, but failed to review it. 85 F.3d 1098, 1108 (3d Cir. 1996). "Had Webb reviewed the agreement, he would have found the

alleged error in the document and this entire dispute could have been averted. There is thus no evidence of any fraud or indication that Webb executed the Agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms.'" *Id.* (quoting *Connors*, 30 F.3d at 490.) Other courts have reached similar conclusions. *See, e.g.*, *Red Online Mktg. Grp., LP v. Revizer, Ltd.*, No. CIV.A. 14-1353, 2015 WL 418143, at *6 (E.D. Pa. Feb. 2, 2015) (finding no excusable ignorance where there was no evidence of significant time pressure and the company had possession of the contract for 5 days before signing and did not review it); *Laborers' Pension Fund v. A & C Env't, Inc.*, 301 F.3d 768, 781 (7th Cir. 2002) (finding no excusable ignorance where, without significant time pressure, an employee executed a clearly labeled collective bargaining agreement but claimed not to understand what it was and did not read it before signing).

I turn to the facts of this case, which demonstrate both misconduct on behalf of a trusted counterparty, Taylor, and significant time pressure, both supporting MZM's claim for fraud in the execution.

Perry's uncontradicted testimony[12] includes several facts that support her claim of excusable ignorance of the terms of the SFA. Most importantly, she testifies that Joe Taylor, the business agent for the Building Laborers' Union Local 1153, represented the 2002 SFA to her as a single-project agreement, without which the union would stop supplying workers for the Newark Airport project, which had already been underway for a year.[13] (PSOMF ¶ 27–29.)

---

[12]     Perry's deposition is the only record evidence that directly addresses the circumstances of the signing of the 2002 SFA. The Funds provide no other firsthand witnesses. Neither Robinson, nor Taylor, nor anyone else involved in the 2002 Newark Airport project, was deposed. The core of the Funds' case is that Perry signed the SFA, and the SFA does not state that it is a single-project agreement.

[13]     MZM expected, and does not dispute, that it was obligated to comply with the provisions of the CBA regarding wages and benefits for the Newark Airport project. It also understood that any conflicts regarding the project would be handled in arbitration pursuant to the CBA. But MZM also expected that it could still undertake other, non-union, projects that would not be covered by the CBA. The central question of this case is whether the SFA bound MZM to abide by the CBA for all future projects.

Before signing the SFA, Perry spoke with Taylor, as well as Lynell Robinson,
the business agent for the Operating Engineers Local 825. (*Id.* ¶ 30.) Both men
confirmed to her orally that, although it did not say so specifically, the SFA was
only for the Newark Airport project and would not bind her to use union labor
on all future projects.[14] (*Id.* ¶ 31.) Perry had known Taylor and Robinson for
years; she described them as mentors who had earlier assisted her in getting
her business off the ground. (*Id.* ¶ 17–20.) She had previously had
conversations with both men about using union labor. They had advised her
that her company was too small to sign on to a statewide CBA and thus could
use union labor, or not, on a job-by-job basis. (*Id.* ¶ 21–22.) Perry's relationship
with Taylor was close; he was something of a mentor and adviser, not just a
counterparty with whom she was negotiating at arms-length. She thus had a
reasonable basis for believing his representations as to the terms of the SFA.
"[T]rusting a representation" of someone with whom she had "a relation of
natural trust and confidence," Perry signed the SFA. (3d Cir. Op. at 27 (quoting
*Kero*, 78 A.2d at 818).) These facts, which the Funds have not rebutted with
evidence, support a finding of fraud in the execution based on
misrepresentations and reasonable reliance under the circumstances.[15]

Beyond the evidence of fraudulent or misleading statements, MZM has
also demonstrated that it was under significant time pressure to sign the SFA.
Perry testified without contradiction that when the 2002 SFA was presented to
her, MZM had already been at work on the Newark Airport project for many
months and was in need of funds to recoup losses from previous jobs. (PSOMF
¶ 24; DSOMF ¶ 31, 34.) The union threatened that if Perry did not sign the
SFA, it would no longer provide laborers for the Newark Airport project, an

---

[14]     MZM has shown that at the time the union used SFAs and single-project
agreements interchangeably. That practice has since changed, which may help avoid
similar disputes in the future. (PSOMF ¶ 43, 74.)

[15]     Here, both sides also relate a course of conduct between the parties after 2002.
I discuss that evidence below in relation to the issue to which it is primarily and most
specifically relevant: whether the parties acted consistent with a single-job 2002
agreement or an ongoing one. *See* Section III.B, *infra.*

implicit threat to halt construction soon if not instantly. (PSOMF ¶ 29, 32.) Relying on Taylor's representation that this was a single-project agreement, Perry read and signed the SFA.[16] (PSOMF ¶ 32, 33; DSOMF ¶ 34.) She states that the pressure of an immediate work stoppage dissuaded her from negotiating a modification to the written language of the SFA regarding future projects. At any rate, she believed the word of her trusted mentors to be a sufficient guarantee that this was a single-project agreement. These circumstances fall short of the strongest version of time pressure, as in *Fawn Mining, supra*—essentially, "Sign right now or lose everything"—but they do tend to bolster Perry's claim that her ignorance of the provisions of the SFA (as now interpreted by the Funds) was excusable.

The Funds argue that the time pressure here was not severe enough to support a finding of fraud in the execution. "Significant time pressure," they argue, must amount to the kind of economic duress which, if exerted by a party, would generally make a contract voidable. (Def. Br. at 12.) It is true that the economic duress doctrine applies only if the pressure exerted to make a defendant sign is "wrongful." *See Cont'l Bank of Pennsylvania v. Barclay Riding Acad., Inc.*, 93 N.J. 153, 177 (1983).[17] And the union's threat to withhold its labor was not "wrongful," say the Funds, because there is a legal right to strike. (Def. Br. at 12–13 (citing *MLI Indus. v. New York State Urban Dev. Corp.*, 205 A.D.2d 998 (3d Dep't 1994)).) That contention is beside the point, however, because the defense here is not duress but fraud in the execution. For present purposes, the element of "significant time pressure" is not redundant of duress, and indeed such time pressure may arise from the situation, rather than the

---

[16]     Perry did not then obtain or read the CBA. She inferably understood that by signing the SFA, MZM would be bound by the CBA, but she believed, as a result of Taylor's representation, that she would be bound only for the Newark Airport project, not for all future projects. The CBA, had she read it, would not itself have specified the duration for which she was signing up.

[17]     Such conduct need not be unlawful, however. The New Jersey Supreme Court has stated "[t]he term 'wrongful' in this context encompasses more than criminal or tortious acts, for conduct may be legal but still oppressive." *Id.*

actions of the other party to the contract.[18] I thus find that the time pressure created by the union's threat to stop work may be considered as part of MZM's claim for fraud in the execution.

Both misleading conduct and time pressure, then, are present, and the evidence of them is uncontradicted. The Funds' strongest counterargument is that the contract itself is evidence enough. Perry, they say, should have read the SFA, taken it literally despite Taylor's representations, and refused to sign if it was not modified in writing to make clear that the SFA applied only the Newark Airport project. (Def. Br. at 7–8.) This argument is essentially a restatement of the background presumption with which this discussion began. (*See* pp. 13–14, *supra.*) As set forth above, that presumption is punctured by sufficient proof of fraud in the execution. The very purpose of that defense is to prevent parties from obtaining signatures to contracts through fraud and misrepresentation. The Funds does not, and on this record cannot, deny that Taylor told Perry that the SFA was a single job agreement, that Perry had reason to trust Taylor, and that the threat of a work stoppage placed her under time pressure.[19]

In conclusion, I find that the uncontradicted record evidence supports MZM's defense of fraud in the execution. Perry was convinced to sign the SFA by misrepresentations made by her trusted mentor against the backdrop of time pressure created by the union's threat to walk off the job if she did not sign. These two factors make the SFA—especially insofar as it purported to make MZM a full signatory to the CBA for all projects, rather than just the

---

[18]     In *Fawn Mining*, for example, the time pressure was occasioned by the current owner's impending closure of the coal mine, not by anything the union did. Yet the court recognized that time pressure as a significant contributor to Fawn's fraud-in-the-execution defense. 30 F.3d at 493. Of course, time pressure artificially created by the party attempting to enforce the contract would only bolster the case for fraud in the execution.

[19]     The Funds' final argument—that MZM's claim is actually one of fraud in the inducement, rather than fraud in the execution—can be disposed of quickly. (Def. Br. at 13–14). That argument was foreclosed by the Third Circuit's holding (3d Cir. Op. at 32), and I therefore reject it.

Newark Airport project—void *ab initio.* In the narrow sense, that conclusion requires that I deny the Funds' demand for arbitration. In the broader sense, it means that there is nothing to arbitrate; because the agreement was void at the inception, MZM was not required under the CBA to remit contributions to the Funds for the use of non-union labor on future projects.

### B. Formation of a Single-project Agreement

The evidence is uncontradicted that Taylor told Perry in 2002 that the SFA was a single-project agreement. One possibility, discussed in the previous section of this opinion, is that Taylor concealed from her the true nature of the agreement. An alternative characterization, no more helpful to the Funds, is that Taylor was sincere—*i.e.*, that he meant what he said, and that *neither* party actually intended, in 2002, to bind MZM to anything more than a one-job contract. So even if the CBA was properly incorporated in relation to the 2002 Newark Airport project, an issue remains as to whether the 2002 SFA also covered MZM's future projects, including those that used non-union labor. Again, the core of the Funds' claim is that MZM owes contributions for work performed by non-union workers between 2015 and 2017. Although I have already found the SFA void at the inception, I consider this alternative version of the argument.

At the preliminary injunction stage, I was unable to determine as a matter of law that the SFA validly incorporated the CBA. (DE 24 at 24.) I now have a more complete record. In general, a court may find that a party may be bound to a CBA where there is "(1) a writing that clearly refers to the CBA and (2) conduct of the defendant that 'evidences an intent to be bound by the [CBA] despite a lack of written consent." *N.J. Reg'l Council of Carpenters*, 495 F. App'x at 233 (citing *Residential Reroofers Local 30-B Health & Welfare Fund v. A & B Metal & Roofing, Inc.*, 976 F. Supp. 341, 344 (E.D. Pa. 1997)). Before a separate document will be deemed to be incorporated by reference into a contract, New Jersey requires a high degree of certainty:

> In order for there to be a proper and enforceable incorporation by
> reference of a separate document, the document to be incorporated

> must be described in such terms that its identity may be
> ascertained beyond doubt and the party to be bound by the terms
> must have had "knowledge of and assented to the incorporated
> terms."

*Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J. Super. 510, 533 (App. Div. 2009) (quoting 4 Williston on Contracts § 30:25 (Lord ed. 1999)), *certif. denied*, 203 N.J. 93 (2010); *see also James v. Glob. TelLink Corp*, 852 F.3d 262, 266 (3d Cir. 2017). That principle suggests that the Court can find an agreement to arbitrate only if (1) the SFAs describe the CBA in such a way that it is clear that they were incorporated into the SFAs; and (2) Perry, on behalf of MZM, knew of, and assented to, the terms of the CBA, which contains the arbitration clause.

First it is clear that the CBA was incorporated in the SFA, at least for some purposes. The Third Circuit held that the SFA clearly referred to the CBA, writing that "it is difficult to conceive how Perry would not have understood that all the essential terms of her agreement with the union were to be found in the separately incorporated documents and that, by virtue of signing the SFA, she was agreeing to be bound by those terms." (3d Cir. Op. at 26.) That is undoubtedly true, but as noted above, she believed she was agreeing to be bound by those terms *for the Newark Airport project only*. On the Newark Airport Project, MZM paid union wages, benefits, and so on, corroborating its intent to be bound by the CBA for that project.

MZM could, however, contractually limit its participation in the CBA, whether by time or by project. The uncontradicted evidence discussed above establishes at a minimum that the parties did not negotiate an ongoing agreement.

The parties' course of conduct after 2002 corroborates the lack of intent for MZM to be bound by the CBA for all future projects. Analyzing such cases, courts have considered "whether the defendant-employer: (a) remitted fringe benefit contributions and union dues; (b) paid union scale wages, as opposed to varying wages; (c) hired non-union workers, in addition to union workers, to

perform work covered by the CBA; and (d) voluntarily submitted to an audit by the Funds." *Fiorentino v. Bricklayers & Allied Craftworkers Local 4 Pension Plan*, 2016 U.S. Dist. LEXIS 135657, at *54–*55 (D.N.J. Sep. 30, 2016) (citations omitted), *aff'd*, 696 Fed. App'x 594 (3d Cir. June 6, 2017). Setting aside the parties' words, I consider whether MZM and the Funds *acted* as if every project undertaken by MZM from 2002 to 2018 was covered by the CBA. I find that they did not.

The most eyebrow-raising anomaly in the Funds' case is that they waited sixteen years before invoking the 2002 SFA. Under the Funds' theory of the case, MZM would have owed unpaid benefit contributions for dozens of non-union projects, starting in 2004.[20] (DE 45-6, Ex. S.) If so, then why the delay in seeking those contributions?[21] Surely if MZM owed contributions for projects in 2004 or 2005 the union could have invoked arbitration. Unions have every incentive to be vigilant and aggressive on such issues. The Funds provide no explanation either for the delay of for the apparently opportunistic decision to undertake an audit in 2018, after waiting sixteen years.[22] To add some perspective, courts have held that an enforcement delay of just two years can support a finding that an employer was not subject to a CBA. *Jayeff Constr. Corp. v. Laborers' Int'l Union of N. Am.*, 2012 U.S. Dist. LEXIS 104872, at *14–15 (D.N.J. July 27, 2012) (concluding, after bench trial, that SFA did not bind

---

[20]   The list of MZM projects provided by the Funds indicates that all three projects that MZM worked on in 2003, including the Newark Airport project were union projects. The first non-union project listed after 2002 is "NJ Transit, Newark, NJ" in 2004. (DE 45-6, Ex. S.)

[21]   The Funds also claims that the 1999 SFA bound MZM to the CBA. That argument fails because it raises the question of why MZM was required to sign another SFA in 2002 if it was already a signatory to the CBA. The more logical reading if that both were intended to be single-project agreements. *See Jayeff Constr. Corp. v. Laborers' Int'l Union of N. Am.*, 2012 U.S. Dist. LEXIS 104872, at *10 –11 (D.N.J. July 27, 2012) (determining after bench trial that "[m]ultiple signed short form agreements supports the Court's conclusion that the parties intended to enter project specific agreements.").

[22]   The Funds do not now seek to recover unpaid contributions for the entire period, only from 2015 to 2017, but their lack of action in the sixteen years before 2018 are still relevant to their course of conduct in relation to the 2002 SFA.

contractor where union did not seek to enforce SFA "until two years after its execution," and contractor continued to work on "non-union construction projects" within jurisdictions of local unions).

Here it is uncontested that MZM undertook dozens of non-union projects between 2002 and 2018 with no challenge from the Funds or the Laborers Union. On those projects, MZM paid non-union wages and did not remit contributions to the Funds. Those facts tend to corroborate the proposition that neither party believed MZM to be a full signatory to the CBA for all purposes. *See N.J. Reg'l Council of Carpenters*, 495 F. App'x at 234 (concluding that conduct did not evince intent to be bound by CBA where contractor "never signed CBA; it contributed to the funds on behalf of five individuals only after those individuals requested that it do so; and all other individuals employed by [contractor] were non-union employees.")

Now it is true that MZM also did projects with union labor, and that when it did so, it remitted contributions consistent with the terms of the CBA. But MZM never even saw the CBA until 2018. It seems to have performed many if not all of its union jobs as a subcontractor to a prime contractor that was subject to the CBA. It is not necessary, then, to hypothesize that MZM was here acting pursuant to its own 2002 agreement; rather, as subcontractor to a union prime contractor, it was billed for the relevant amounts and paid them, generally without protest.

In short, MZM's actions were consistent with an understanding that the 2002 Agreement was for one job only. On all subsequent jobs, MZM paid benefits when it employed union labor, and did not pay benefits when it did not employ union labor. That is what an employer not bound by the CBA on an ongoing basis would be expected to do. And MZM did so without objection until 2018.

In 2018, it is true, MZM submitted to an audit. As Perry explained, this is not unusual, because MZM was required to do so on jobs employing union labor. (PSOMF ¶ 96.) Allowing the Funds to audit MZM's books is consistent with MZM's having performed both union and non-union projects, and having

complied with the CBA when working on union projects. Thus it appears that, from 2002 until 2018, everyone involved treated the 2002 SFA as a single-project agreement. That course of conduct supports the conclusion that Taylor, if he did not mislead Perry in 2002, actually told her the truth: *i.e.,* that the SFA she signed was contemporaneously intended by *both* sides to be a single-project agreement.

Finally, the Funds submit as evidence certain remittance forms that reference the CBA, filed by MZM on behalf of union workers. (Def. Br. at 16–17.) That MZM used such forms when it paid union benefits on union projects does not advance the Funds' position regarding non-union projects. The forms relate to payment of contributions for particular workers, concededly members of the union, on particular projects. Courts have given (limited) weight to such small-print boilerplate on remittance forms only for limited purposes, in conjunction with a signed CBA. *See N.J. Reg'l Council of Carpenters*, 495 F. App'x at 234 (concluding that remittance form "alone, is not enough to bind a non-signatory employer to a CBA" and remittance forms at issue were limited to "payment of fringe benefits" for the particular employees listed in the form) (citing *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 650 (7th Cir. 2001) ("[T]he monthly remittance reports accompanying these payments contained a declaration signed by the defendant . . . . Boilerplate it was, but it was entitled to some weight."); *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 346 (E.D.N.Y. 2009) (concluding that union could seek contributions from employer based on the existence of signed CBA *as well as* remittance reports))). The existence of these forms, therefore, does not impact my conclusion that MZM's 2002 SFA did not render it a full signatory to the CBA for all purposes.

## IV.    Conclusion

In summation, I hold that, to the extent the 2002 SFA was intended by the union to bind MZM to the CBA for future projects, it is void for fraud in the execution. In the alternative, if the 2002 SFA was simply negotiated as a single-

project agreement, then MZM never was bound to the CBA for future projects. Either way, MZM was not bound to make contributions to the funds on future non-union projects or to submit to arbitration related to those projects.

For the reasons stated above, MZM's motion for summary judgment (DE 46) is **GRANTED** and the Funds' motion for summary judgment (DE 45) is **DENIED**. An appropriate order follows.

Dated: May 3, 2022

/s/ Kevin McNulty

_____

**KEVIN MCNULTY**
**United States District Judge**

28